Filed 5/25/16  P. v. Delamora CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C076142 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F03010) |
| v. | |
| FRANK DELAMORA et al., | |
| Defendants and Appellants. | |

After defendant Frank Delamora fired 20 to 30 rounds from an AK-47 type assault rifle at men he believed to be rival gang members, he and defendant Jesus Ceja Montano led the police on a high-speed chase with Delamora continuing to fire the assault rifle out of Montano's passenger window.  The chase ended when the pursuing police officer lost sight of the car as it sped down the freeway.  In its simplest form, Montano's defense at trial was that the events of that night were a surprise to him, and his driving was motivated by fear, shock and the shooter's orders.  Montano took this position notwithstanding that he was the owner of the assault rifle.  For his part, Delamora contended the prosecution had not established that he was the shooter.

1

On January 16, 2014, defendants were charged by amended information with nine counts of attempted murder, each as to a different civilian (counts 1-4, 7-11); attempted murder of a peace officer (count 5); assault with a semiautomatic firearm on a peace officer (count 6); discharging a firearm at an occupied motor vehicle (count 12); and discharging a firearm at an inhabited dwelling house (count 13).  It was alleged as to all counts that the crimes were committed for the benefit of, at the direction of or in association with a criminal street gang—the Sureños—with the specific intent to promote, further or assist in criminal conduct by gang members.  (Pen. Code, § 186.22, subd. (b)(1).)[1]

The amended information further alleged Delamora personally and intentionally discharged a firearm as to all counts (§ 12022.53, subd. (c)).  The amended information also alleged that Delamora had a serious prior felony conviction (§§ 667.5, subd. (b), 667, subds. (b)-(i)).  As to Montano, it was alleged as to all counts that he was a principal and at least one principal personally and intentionally discharged a firearm (§ 12022.53, subds. (c) & (e)(1)) and was armed with a firearm (§ 12022, subd. (a)(2)).

On February 24, 2014, a jury found defendants guilty on counts 1-7 and 12-13 and found true all of the allegations.  The jury did not reach a verdict on counts 8-11 and the court declared a mistrial on those counts as to both defendants.  In a bifurcated proceeding the next day, the trial court found Delamora's prior strike conviction to be true.  On March 21, 2014, the trial court sentenced Delamora to a total term of 192 years and four months plus 74 years to life in prison.  The court sentenced Montano to a total term of 94 years plus 37 years to life.  The court noted it was "choosing consecutive time because each of these cases or each of these counts reflect a different victim and each

---

[1] Undesignated statutory references are to the Penal Code.

2

case is a different time and place." The court ordered both defendants to pay restitution and imposed various fees. Additionally, the court ordered Delamora to pay attorney fees.

On appeal, defendants challenge the admission of various statements and testimony at trial, the propriety of certain jury instructions and the absence of others, whether substantial evidence supported Montano's convictions under an aiding and abetting theory, whether substantial evidence supported the gang enhancement, the trial court's imposition of consecutive sentences, and the attorney fees order.

With respect to the gang enhancement, Delamora and the People submitted supplemental briefs on the effect of our Supreme Court's recent decision in *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*). In that case, our Supreme Court "decide[d] what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id*. at p. 67.) The People contend that this case is distinguishable from *Prunty* because, with respect to the predicate acts, their gang expert "provided testimony relating to one gang—the Sureño gang in Sacramento County." We disagree. The prosecution's theory and evidence in this case was not meaningfully different than the prosecution's theory and evidence in *Prunty*. Thus, we are compelled to conclude there was insufficient evidence that defendants committed the offenses for the benefit of, at the direction of or in association with a criminal street gang, with the specific intent to promote, further or assist in any criminal conduct by gang members. (§ 186.22, subd. (b)(1).) Accordingly, we will reverse this finding. Moreover, because Montano was also found to qualify for an enhancement under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b) as an element of that enhancement, we must also reverse this enhancement as to Montano. We also reverse the attorney fees order because there was no evidence Delamora had the ability to pay them. In all other respects, we affirm defendants' convictions and enhancements, and remand the matter to the trial court for resentencing.

3

# I.  BACKGROUND

## A.     *Shooting at the Sunnyslope Apartments*

After midnight on April 11, 2010, Andre Pointer, Michael Lee, Jami Buntun and Jesus Meses were walking back to an apartment complex on Sunnyslope Drive after buying beer from a nearby liquor store.  They were approached by a man who yelled, "Ant, where's my money?"  Meses later admitted that he knew Ant, and Ant was a member of the Norteño gang who sold drugs at the Sunnyslope apartments.  But at the time, they denied knowing Ant or what the man was talking about.  Despite the denials, the man immediately opened fire with an assault rifle.  At the time, his targets were near a white vehicle.

Shortly before the shooting, security guard Cecilio Bustillos observed Delamora "getting into the trunk [and] [Montano] was getting into the driver's seat" of a Mustang.  Bustillos later heard Delamora yelling at the four men and then saw Delamora fire between 20 and 30 shots from an assault rifle at them.  Delamora was reaching for another magazine when he locked eyes with Bustillos, who was in the process of calling 9-1-1.  At that point, Delamora returned to Montano's car, and they drove off in the direction of Florin Road.

Efren Gonzalez testified that he was a member of the Barrio Sur Trece subset of the Sureño gang until 2011.  On the evening of April 10, 2010, he attended a party at a motel with other Sureño gang members from various subsets including Howe Park Sureños and Triangle Park Sureños.  Delamora and his brother, Jesus Delamora, are members of the Howe Park Sureño subset.  Gonzalez confirmed that their nicknames are Chino and Chato, respectively.[2]  Montano drove Gonzalez, Delamora and Jesus from the party to the Sunnyslope apartments to buy marijuana.  Gonzalez and Jesus hopped the

---

[2]  We will refer to them as Delamora and Jesus, respectively.

fence to get inside the apartment complex and left Montano and Delamora in the car outside the complex. Gonzalez was in one of the apartments when he heard gunshots. He ran outside but Montano, Delamora and the car were gone. Gonzalez and Jesus started walking back to the motel, and called for a ride along the way. Montano returned to the motel by himself; Delamora never returned at all.

As a result of the shooting at the Sunnyslope apartments, Bunton had gunshot fragments in his thigh. Ted Lozano's white truck was struck by 11 bullets. Another bullet entered Elsa Hethorn's apartment.

B.      *High-Speed Chase*

California Highway Patrol (CHP) Sergeant David Costa was traveling south on Stockton Boulevard with a civilian ride-along, Kevin Tasler, when he saw a Mustang traveling "at a very high speed" and sliding slightly as it made the turn from Florin Road to Stockton Boulevard. Sergeant Costa activated his lights and proceeded after the car, which was "travelling at a speed in excess of 80 miles per hour." The car stopped briefly in front of a mobile home park and he saw that there were two individuals inside, a driver and a passenger. Sergeant Costa reported the car's license plate to dispatch.

The Mustang sped into the mobile home park. Sergeant Costa followed the Mustang toward a cul-de-sac, entering just as it had turned so that Sergeant Costa's patrol car was facing the driver's side of the Mustang. He saw the passenger elevate himself out of the passenger side window and level an AK-47 type assault rifle at him over the roof. Sergeant Costa heard two shots as he put his patrol car in reverse and backed out. He notified dispatch that he was taking fire.

The Mustang then turned out of the cul-de-sac towards Stockton Boulevard and Sergeant Costa pursued. He heard more shots. The Mustang turned onto Mack Road, then sped onto northbound Highway 99. As Sergeant Costa entered the freeway, he saw the muzzle of the assault rifle flash and heard multiple shots fired. The car was about 300 yards away and the distance was growing. He estimated at least 20 total shots were fired

5

on the freeway. The Mustang was traveling at least 100 miles per hour in one of the left lanes. The other traffic was moving to the right lanes. Among them was Elizabeth West, who was driving northbound on Highway 99 in the carpool lane with her three children. When she saw flashing lights in her rear view mirror, she moved to the right so that Costa's patrol car and the car it was pursuing could pass her. She saw the passenger of the pursued car had his head hanging out of the window and was looking back at the CHP car. She heard popping sounds and saw flashes of light coming from the passenger side of the car. A gunshot pierced West's windshield and penetrated the front passenger seat. West's daughter was injured by the debris.

Sergeant Costa lost sight of the shooter's car and terminated his pursuit after the 47th Avenue exit.

Pamela Dow lived in an apartment with a view of the 47th Avenue off-ramp. She told an officer that, on the night of the shooting, she heard a loud noise and then saw a car parked on the right shoulder of the exit. One man was near the driver's door and another man ran from the car. "She said the driver was yelling, Chino, get back here . . . and said that a couple times."

C. *Montano's Interview*

In the early morning of April 11, 2010, Detective Brandon Luke with the Sacramento County Sheriff's Department was called to a motel next door to a CHP station on Massie Court to assist in the investigation. Previously, a police officer had been dispatched to the motel regarding a noise complaint, and found the Mustang matching the description and license plate number from the high-speed chase. When Detective Luke arrived, Montano and Pedro Pantoja were in custody.

Detective Luke and his partner, Detective Goncalves, interviewed Montano and Pantoja at the sheriff's station. The detectives interviewed Pantoja first. Pantoja acknowledged that he was a Triangle Park Sureño, but was adamant that he had not been involved in a shooting.

6

Next, the detectives interviewed Montano.  They asked him repeatedly about Pantoja and suggested Pantoja claimed to be in Montano's car.  Montano first denied knowing Pantoja and then that Pantoja was in the car.  Eventually, Montano acquiesced: "Alright then. . . .  He was in."  From there, Montano answered questions about the evening.  They went to the apartment complex "to pick up some weed."  There were only two of them in the car.  At the apartment complex, Montano explained that he and his passenger encountered what they believed to be Norteños.  Montano's and his passenger's Sureño affiliation would have been apparent by the music Montano was blaring "[c]ause it talks about south siders."  This is where the trouble started.  Montano's passenger got out.  Shots were fired and Montano told his passenger to get back in the car so they could go.  They took off, but were followed by CHP into the mobile home park.  Montano and his passenger "weren't gonna get pulled over."  When Detective Luke asked if that meant Montano was going to get away, Montano replied, "Yeah, I did."

Montano described that, when they came to the dead end, his passenger "said not to get caught.  I told him to hold on.  And I got outta there."  "I was like . . . don't even worry about it, I got this."  Montano was noncommittal about whether gunshots came from his car at this point.  When he was asked why law enforcement did not approach when he pulled into the cul-de-sac, Montano surmised that "[t]hey got scared."  "Cause I flipped the bitch so fast.  They didn't think I was gonna be able to do that."

Montano drove to Highway 99.  He did not see any law enforcement vehicles behind him until about five minutes later.  He boasted that he was too fast for them.  He denied that there were any gunshots when they were on the freeway.  When he was asked about how the passenger was positioned and whether Montano had to be careful not to throw the passenger out of the car, Montano volunteered, "Well I needed to get you guys off me then I can get away."  The passenger told Montano not to get caught:  "He was like don't get pulled over.  Don't—don't stop."

7

As soon as he didn't see any sirens behind him, Montano exited the freeway driving about 130 miles an hour. "I lost you guys, didn't I?" But he also lost control of his car. He said he was not sure what exit he took because he was not paying attention: "I just wanted to get away." Montano got out to inspect his car for damages when what appeared to be a security officer told Montano to get away from the car before he realized it was Montano's. "I was like yeah, that's my car. Good thing he didn't get close to me." From there, Montano restarted the car and returned to the motel.

Montano said he did not recall if the person who was with him went into the motel room, too. "I didn't care about what he did or what he didn't do." He left the assault rifle in the car. He had purchased it for $300 two years earlier. When he was asked why he would "allow" someone else to use his gun, he responded, "Cause like I said, I was the driver. When you run passenger, you're the trigger man. Simple as that."

Detective Luke asked Montano if something happened that had made him think he could trust the passenger "to ride wit[h] him like that." Montano responded, "Yeah, cause he showed me his piece." Detective Goncalves asked what Montano called his passenger. Montano said, "Monster." Monster is not Delamora, but Pantoja. The interview ended shortly after Montano said, "I wanna see the paper that [Pantoja]'s sayin that he was in my car." There was nothing to show Montano because Pantoja had denied being in the car. When Detective Luke shifted the focus to other witnesses, Montano accused him of lying and ended the interview.

The prosecutor played the detectives' interviews with Montano for the jury.

C.  *Montano's Conversation with Pantoja*

After the detectives interviewed Pantoja and Montano separately, they placed them in a room together. A transcript of the conversation (translated from Spanish to English) was read to the jury and admitted as an exhibit. Montano asked Pantoja what he was being charged with. Pantoja told him, "They were saying that I shot, I shot—I didn't even know what in the world was happening, man." Montano offered, "They say that

according to you, you said you were with me. That you arrived with me in my car." Montano explained some of the driving he did, and Pantoja said he was inside sleeping at the time. They compared interview notes and pondered their fates. Pantoja asked, "Why are they saying this fucking ridiculous shit? I wasn't with you." He said he would pay for being caught with a gun, but there were many witnesses who could say that he did not go with Montano. Montano alluded briefly to his passenger, and the fact that when Montano lost control of the vehicle at the exit, "he took off running" and "[h]e fled, . . . who knows where he went."

D.      *Pantoja's Preliminary Hearing Testimony*

A transcript of Pantoja's preliminary hearing testimony was read to the jury. At the time of the preliminary hearing on June 29 and July 6, 2011, Pantoja had been in custody for more than a year under a charge of carrying a concealed weapon coupled with an allegation that Pantoja committed the crime for the benefit of or in association with the Sureño criminal street gang. Pursuant to a plea agreement with the district attorney, he had pled guilty to a felony charge of carrying a concealed weapon and agreed to testify truthfully against Montano and Delamora. In exchange, the district attorney agreed to dismiss the gang allegation, and Pantoja would be sentenced to 150 days in county jail with five years of probation. Pantoja testified that he was under a hold from the United States Department of Citizenship and Immigration Services.

Pantoja said that, on the night of the shooting, he was already inside the motel when Montano and Delamora first arrived. He joined them outside and saw the assault rifle in the trunk of Montano's car. Three days earlier, Montano had showed him the same gun in the trunk of the car, also in the presence of Delamora.

After they were arrested, Montano told Pantoja what happened that night. Montano, Delamora and Efren Gonzalez went to the apartment complex to buy marijuana. Gonzalez had gone to the apartment where the sale was to take place while Montano and Delamora waited in the parking area. "[T]hen some persons were

9

approaching making a lot of noise, so [Montano said] that [Delamora] went to the car, got the gun and started firing." Montano told Pantoja he did not expect this to happen. Pantoja agreed that Montano told him that he was terrified and afraid because of what happened. Montano and Delamora "left at a high speed" and were followed by the CHP. Montano thought about pulling over, but did not. After Montano lost control of the car, Delamora ran away.

At some point on the night of the shooting, Pantoja noticed that Montano, Delamora, Jesus and Gonzalez had left the motel. He overheard a telephone conversation about a high-speed chase and someone left to pick up Gonzalez and Jesus. When Jesus returned, he asked Pantoja for a cigarette and they went outside to smoke. Almost immediately, Montano returned by himself in his car. "[Jesus] was very angry when he saw that his brother did not return with [Montano]." Montano appeared nervous and tense, and would not answer Jesus's questions about where Delamora was. They returned to the room, where Jesus and Montano had to be separated. Pantoja left because he had a gun on him and was afraid he would be arrested, but he was approached by an officer just outside the door. More officers arrived. One of the officers saw the gun leaned against the front passenger seat of Montano's car, and another asked Pantoja if he had a gun. He told them he did and he was arrested. Pantoja never saw Delamora again that night.

E. *Bustillos' Identification of Delamora*

1. *Photographic Lineup*

Three days after the shooting, on April 14, 2010, Bustillos, the security guard from the Sunnyslope Apartments, viewed a photographic lineup. He said that he could have sworn the individual in the sixth photograph was the shooter. This individual was not Delamora, who was shown in the fourth photograph. Bustillos testified that after this identification, he asked the detectives if he was correct, and they said they could not tell

10

him that. He also testified that, prior to seeing Delamora and the photographs again at trial, he was unaware that he did not select the right person in the photographic lineup.

### 2. *Physical Lineup*

Two weeks after the photographic lineup, Bustillos viewed a live lineup. Bustillos requested that the candidates turn to the right so he could see their left sides, as he had during the shooting. After they turned, Bustillos said he was sure the man in position five was the person he saw with the assault rifle. This person was Delamora.

## II. DISCUSSION

### A. *Montano's Motion to Suppress*

Montano asserts that the statements he made to detectives should have been excluded because they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We disagree. The trial court correctly ruled that Montano waived his *Miranda* rights at the outset of the interview and never unambiguously and unequivocally invoked them thereafter.

### 1. *The Interview*

At the beginning of the first interview with Montano, Detective Luke asked Montano if he had ever had his rights read to him before. Montano had not. Detective Luke told Montano, "I'm going to read them to you. I need you to verbally acknowledge that you understand the rights as I read them to you." The detective continued, explaining: (1) Montano had the right to remain silent; (2) anything Montano said could and would be used against him in court; (3) Montano had the right to the presence of an attorney before and during any questioning; and (4) if Montano could not afford an attorney, one would be appointed free of charge before and during any questioning. After each right, Detective Luke asked Montano if he understood the right and Montano replied affirmatively. When they finished, Montano initiated the conversation: "Now what am I being arrested for?" He added quickly, "Since you guys didn't want to tell me from the

11

beginning . . . for like three hours in here I been wantin[g] to go to the bathroom.  I know my rights."

Montano dissected the detectives' subsequent questions; his answers were sharp and purposefully unhelpful.  When Detective Luke asked Montano where he went after he left the party, he replied, "Here."  He pointed it out when they asked questions that assumed facts he had never provided or that had already been answered.  He attempted to elicit information from them.  He mostly only told them what they already knew.  He explained that he had been having a good time at the motel.  He drove there, but the car was not his.  He said he did not remember whose car he drove, when he arrived at the motel, whether he picked anyone up or went anywhere else first, how long he was at the motel, whether he left to go anywhere else, or the names of anyone who was there.  He also denied knowing Pantoja.

After ten minutes, the following exchange occurred:

"DET. LUKE:  Okay.  Is there a reason why you don't know any of these questions?

"J. MONTANO:  I don't know.

"DET. LUKE:  Are you willing to go into court, which you'll have to go into court at some point and time and your story is gonna be, I don't know.

"J. MONTANO:  I want to talk to—when I see the judge then I guess I'll—I'll talk to him.

"DET. LUKE:  Well, they're gonna go off the documentation that we've provided for them.  Long before—

"J. MONTANO:  That's fine.

"DET. LUKE:  —they ever—what they gonna go off.  Long before they're gonna hear anything from you.

"J. MONTANO:  I'll take my chances, I guess.

12

"DET. LUKE:  So do—are you willing to give your side of the story?  So we can document that and give it to the judge?

"J. MONTANO:  Not really.  I want to see a lawyer in front of me.

"DET. LUKE:  So you don't wanna talk to us?

"J. MONTANO:  Not really.

"DET. LUKE:  Who do you wanna talk to?

"J. MONTANO:  No one.  What is there to talk to you about?

"DET. LUKE:  Your side of the story.

"J. MONTANO:  What side of the story?  I don't remember."

With that, Montano proceeded with his evasive answers.

2.  *Trial Court's Ruling*

At the hearing on Montano's motion to suppress his statements to the detectives, his trial counsel relied on the above passage in arguing that Montano invoked his right to have a lawyer present with him during questioning and his right to remain silent, and the detectives should have stopped further questioning at this point.  The trial court found that Montano initially impliedly waived his rights by initiating the conversation with the detectives when he asked what he was being arrested for.  The court reviewed the recording of the interview "many times."  "In watching the tape, I reviewed the defendant's demeanor.  There's no confusion.  There's no naivete.  He's not a child or inexperienced.  He's, in fact, quite assertive.  And at times he's sparring with the officers over the semantics of the questions and saying you said this and I didn't say that and it's—there isn't anything about this that appears to be involuntary."  The trial court found his subsequent statements were ambiguous and insufficient to invoke his rights under the applicable case law, including *Davis v. United States* (1994) 512 U.S. 452.  With respect to Montano's comment that he wanted to see a lawyer in front of him, the trial court said, "In context he's talking about giving his side to the Judge, or can it be construed to be at the moment he wants to see a lawyer in front of him?  [¶]  And the problem is because

13

it's questionable it appears to be ambiguous. [¶] The officer did ask some further questions to clarify and say so you don't want to talk to us, and he answered by not really. That's—that is not an unequivocal [statement]." Similarly, the trial court found that when Montano stated he did not want to talk to anyone "that is in context when the detective is saying do you want to give your side of the story, do you want to give it to the Judge." The court also noted that at times what Montano says is not clear, and it did not necessarily agree with the transcript. Regardless, Montano kept talking. "He doesn't in context appear to be indicating to the officers that he wants to cease the questioning. [¶] So it does not appear that he has invoked his right. [¶] He continued to talk to the officer, and he appears to do so voluntarily." Accordingly, the trial court denied the motion to suppress. We conclude that the trial court's conclusions are both legally and factually supported.

### 3. Whether Montano Invoked His Miranda Rights

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.) *Miranda* provides that a suspect in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479.) After the warnings have been given, if the suspect indicates in any manner that he wishes to remain silent or consult with an attorney, the interrogation must cease (until an attorney is present if the suspect invokes his right to counsel). (*Id.* at pp. 473-474.) Otherwise, " 'any statement obtained from him during interrogation thereafter may not be admitted against him at his trial' [citation], at least during the prosecution's case-in-chief." (*People v. Lessie* (2010) 47 Cal.4th 1152, 1162.) A suspect may also waive his rights expressly or impliedly. (*People v. Nelson, supra,* at pp. 374-375.) "To establish a

14

valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*Id*. at pp. 374-375.)

Whether, after initially waiving his rights, a suspect subsequently invokes them is a separate question subject to an objective inquiry. (*Davis v. United States, supra,* 512 U.S. at pp. 458-459; *People v. Williams* (2010) 49 Cal.4th 405, 427.) The suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States, supra,* at p. 459.) "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Ibid*.) The requirement of an unambiguous and unequivocal assertion also applies to a suspect's invocation of the right to silence. (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381.)

"Where, as was the case here, an interview is recorded, the facts surrounding the admission or confession are undisputed and we may apply independent review." (*People v. Duff* (2014) 58 Cal.4th 527, 551.) "While we must review the record and make an independent determination of the question, we . . . may 'give great weight to the considered conclusions' of a lower court that has previously reviewed the same evidence." (*People v. Jennings* (1988) 46 Cal.3d 963, 979.)

Montano confirmed that he understood his *Miranda* rights. Then, he initiated the conversation by asking what he was being arrested for and reiterating that he knew his rights. His waiver was knowing, intelligent and voluntary.

In deciding whether any of Montano's postwaiver statements invoked his rights, we must view them in context. "In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends." (*People v. Williams*, *supra*, 49 Cal.4th at p. 429.) As the trial court noted, Montano's

15

reference to wanting to see an attorney "in front of" him was in the context of being asked to consider what he would do in court. A reasonable officer could interpret Montano's statement as referring to an eventual court appearance, rather than an effort to invoke his right to counsel at that moment. Taken literally, the phrase "in front of" is more suggestive of a courtroom than an interrogation room. Thus, before resuming questioning, Detective Luke engaged in "good police practice" when he attempted to clarify Montano's statement by asking if he wanted to speak to the detectives. (*Davis v. United States, supra,* 512 U.S. at p. 461.) Montano's response did not clarify that he wanted to speak to an attorney; instead it was ambiguous as to whether he now wished to remain silent: "Not really." (Cf. *People v. Silva* (1988) 45 Cal.3d 604, 630-631 [affirming trial court's finding that it was clear from defendant's inflection that he was not suggesting he wanted to end the interrogation when he said, "I don't know. I really don't want to talk about that"].) Detective Luke followed up again by asking who Montano wanted to talk to. Montano said, "No one," but then immediately asked what the detectives wanted to talk about. Considering the totality of the circumstances, we find that Montano's statements were not an unambiguous and unequivocal invocation of his rights. When he made the statements at issue, his posture and tone never changed. He appears no different than when he is answering other questions. The clearest indication he gave detectives regarding his intent was when *he* continued the questioning by asking what there was to talk about. (See *People v. Williams, supra,* at p. 433 ["Moreover, prior to the resumption of questioning, [the interviewing officer] *clarified* defendant's actual intent—clarification that the high court has denominated good practice (although not required) in similar circumstances"].) The trial court did not err in denying Montano's motion to suppress.

16

*B.     Delamora's Motion to Sever*

*1. Background*

On December 18, 2013, Delamora filed a motion to sever the joint trial of Delamora and Montano or, alternatively, to prohibit the prosecution from using Montano's extrajudicial statements on the basis that they inculpated Delamora in violation of his Sixth Amendment right to confront witnesses under the *Aranda/Bruton* rule. (See *Bruton v. United States* (1968) 391 U.S. 123, 135-136 (*Bruton*) [admission of nontestifying codefendant's "powerfully incriminating extrajudicial statements" inculpating the other defendant violated that defendant's rights to confrontation and cross-examination].)[3] The trial court denied both motions. The statements at issue were: (1) Montano's statements to Pantoja, and (2) Montano's statements to the detectives. With respect to the latter, the trial court ruled that it "is clearly not testimonial, and it doesn't raise a Crawford issue." (See *Crawford v. Washington* (2004) 541 U.S. 36, 68 (*Crawford*) ["Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination"].) With respect to the former, the trial court ruled that "none of that implicates Mr. Delamora at all. In fact, it could be the contrary."

---

[3] In *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*), which preceded *Bruton, supra,* 391 U.S. 123, our Supreme Court adopted an approach similar to the *Bruton* rule as "judicially declared rules of practice." (*Aranda, supra,* at pp. 530-531.) Since then, our Supreme Court has declared that "[t]o the extent that our decision in [*Aranda*] constitutes a rule governing the admissibility of evidence, and to the extent this rule of evidence requires the exclusion of relevant evidence that need not be excluded under federal constitutional law, it was abrogated in 1982 by the 'truth-in-evidence' provision of Proposition 8 (Cal. Const., art. I, § 28, subd. (d))." (*People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

*2. Delamora's Confrontation Rights Under Aranda/Bruton*

"The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'  The right of confrontation includes the right of cross-examination." (*People v. Fletcher*, *supra*, 13 Cal.4th 451, 455.)  "The *Aranda/Bruton* rule addresses a specific issue that arises at joint trials when the prosecution seeks to admit the out-of-court statement of a nontestifying defendant that incriminates a codefendant." (*People v. Capistrano* (2014) 59 Cal.4th 830, 869.)  Specifically, these cases "stand for the proposition that a 'nontestifying codefendant's extrajudicial self-incriminating statement that inculpates the other defendant is generally unreliable and hence inadmissible as violative of that defendant's right of confrontation and cross-examination, even if a limiting instruction is given.' [Citation.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 652.)  "The United States Supreme Court 'limited the scope of the *Bruton* rule in *Richardson v. Marsh* (1987) 481 U.S. 200. . . .  The court explained that *Bruton* recognized a narrow exception to the general rule that juries are presumed to follow limiting instructions, and this narrow exception should not apply to confessions that are not incriminating on their face, but become so only when linked with other evidence introduced at trial.' " (*People v. Homick* (2012) 55 Cal.4th 816, 874.)

In *Crawford*, the United States Supreme Court significantly altered the general confrontation clause analysis when it held that "[w]here *testimonial* evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Crawford*, *supra,* 541 U.S. at p. 68, italics added.)

On appeal, Delamora fails to analyze the two distinct sets of out-of-court statements made by Montano separately.  The first—Montano's statements to Pantoja—was not testimonial.  (See *People v. Hajek* (2014) 58 Cal.4th 1144, 1214 ["Private

18

communications between inmates are not testimonial, and their admission would not violate the principle laid down in *Crawford* that bars the use at trial of testimonial out-of-court statements as to which no opportunity for cross-examination was afforded"].) Delamora does not contend otherwise. Instead, he asserts that "even to the extent *Crawford* limits the Confrontation Clause's reach to 'testimonial' hearsay [citations], it need not affect the *Bruton* rule," which holds that a defendant is deprived of his Sixth Amendment right to confrontation when a nontestifying codefendant's "powerfully incriminating extrajudicial statements" inculpating the other defendant are admitted in a joint trial (*Bruton, supra*, 391 U.S. at pp. 135, 136) and, he alleges, "treats *all* nontestifying codefendant inculpatory hearsay in a joint trial as testimonial." Not so. Because *Bruton* is premised on the Confrontation Clause, the *Bruton* rule also does not apply to nontestimonial statements. (*People v. Arceo* (2011) 195 Cal.App.4th 556, 572-575.) Thus, there was no *Bruton* error with respect to Montano's statements to Pantoja.

While the People concede that Montano's statements to the detectives were testimonial, their admission did not offend the *Bruton* rule either because the rule "extends only to confessions that are not only 'powerfully incriminating' but also 'facially incriminating' of the nondeclarant defendant." (*People v. Fletcher, supra,* 13 Cal.4th at p. 455, quoting *Richardson v. Marsh, supra*, 481 U.S. at pp. 207-208.) In his statements to detectives, Montano did his best to incriminate *Pantoja*. Not only were these statements not facially incriminating with respect to Delamora, they were some of the best evidence to support Delamora's defense that he was not the shooter. For that reason, there can be no *Bruton* error with respect to the admission of Montano's statements to the detectives, either.

19

C.    *Pantoja's Preliminary Hearing Testimony*

  *1. Background*

On December 23, 2013, the prosecution filed a motion to admit Pantoja's preliminary hearing testimony.[4] In the motion, the prosecutor explained that after Pantoja was sentenced and his time had been served, he was removed from the United States due to his convictions and lack of legal status as a citizen. This possibility had been discussed at the preliminary hearing to no resolution. The prosecution noted that once Pantoja was sentenced, "the INS hold will take precedence and INS would take him into court immediately. As long as he still has pending charges, the INS does not take him automatically." The prosecution stated it would be "taking steps to keep him here," but ultimately explained, "The only way I can say for sure that he won't be taken right away is if he's not sentenced. But he has a right to be sentenced at this point." On Pantoja's agreement, the trial court scheduled sentencing for July 29, 2011.

The prosecution's motion attached a written statement from district attorney investigator Greenwood detailing his attempts to locate and contact Pantoja. The statement explained that in February 2012, Greenwood had contacted the mother of Pantoja's children, Jennifer Zazueta. She had not spoken to Pantoja in more than a year but said he was staying at his grandmother's ranch near Lázaro Cárdenas, Michoacán, Mexico. The last known contact number she provided Greenwood was a dead end. Greenwood contacted a San Diego County district attorney investigator who had law enforcement connections in Michoacán. Greenwood spoke to the other investigator several times over the next few months, but the investigator's contacts were unable to locate Pantoja. In May 2012, Zazueta informed Greenwood that she had been in contact

---

[4] Delamora and his counsel had previously filed separate in limine motions to exclude this testimony on the basis that it was hearsay and violated Delamora's right to confront witnesses and cross-examine them at trial.

with Pantoja and that he was willing to return to the United States to testify. She did not have a current telephone number for Pantoja. In October 2012, Greenwood received a call from Pantoja at Zazueta's prompting. Pantoja said he was willing to return to the United States to testify if he was given time to see his children and money for his expenses. Pantoja said he was still staying at his grandmother's ranch "about 4 ½ hours from town." Greenwood said he would pass on the requests. In November, Pantoja contacted Greenwood again and said he would call again in December to check on the status of the case. It was Greenwood who called Pantoja several times in December with no success. The following March, Pantoja changed his conditions. He would only return to the United States if he was issued a work permit. Greenwood promised to pass on this condition and Pantoja promised to call back during his next trip to town. The calls continued, but Pantoja refused to provide the exact location of the ranch or any additional contact information. Meanwhile, Greenwood finally received word that the Mexican authorities had established contact with Pantoja in October 2012 and he told them he was *not* willing to return to the United States. In June 2013, Pantoja told Greenwood that he now needed $5,000 for his time to return to the United States. Greenwood told Pantoja that Greenwood would look into compensation for lost wages but that Pantoja would need to provide documentation to support his claimed income of $2,500 per week. Pantoja said he would get back to Greenwood, but Pantoja never did and he never returned another call.

At the hearing regarding the admission of Pantoja's preliminary hearing testimony, counsel for both defendants accepted the investigator's written statement in lieu of live testimony. The trial court distinguished the main case relied upon by defendants, *People v. Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*), on the basis that "it appears that everyone was aware of the potential of Mr. Pantoja being deported prior to trial." The court found that the prosecution had exercised due diligence. "It would not have been reasonable in this case, which is different than something that was suggested in

21

Roldan, for the Court to keep that witness in custody pending a trial. [¶] We didn't know at the time of the prelim when that trial would be. I don't have the prelim date on the top of my head, but I'll note that the charges were in 2010, and we're now in 2014. [¶] So to keep the witness in custody all that time, even though the Court has the authority to do that, would not have been reasonable in this situation." Therefore, and because both defendants had an opportunity to cross-examine Pantoja at the preliminary hearing, the court granted the motion to admit the preliminary hearing testimony.

        *2. Prosecutions' Efforts to Obtain Pantoja's Presence at Trial*

Defendants argue the admission of Pantoja's preliminary hearing testimony violated their state and federal right to confront and cross-examine the witnesses against them. They concede, however, that this right is not absolute and "[a]n exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination." (*People v. Fuiava* (2012) 53 Cal.4th 622, 674-675.) Here, the only issue is whether Pantoja was "unavailable." "A witness who is absent from a trial is not 'unavailable' in the constitutional sense unless the prosecution has made a 'good faith effort' to obtain the witness's presence at the trial." (*People v. Herrera* (2010) 49 Cal.4th 613, 622.)

"[T]o establish unavailability, the prosecution must show that its efforts to locate and produce a witness for trial were reasonable under the circumstances presented. (*People v. Herrera, supra,* 49 Cal.4th at p. 623.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence." (*Ibid.*)[5] "The term '[r]easonable diligence, often called "due diligence" in

---

[5] We reject Defendants' assertion that on review we give any meaning to the fact that the record before us contains no evidence regarding the prosecution's attempts *after* the trial court's ruling.

case law, " 'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' " ' [Citation]. Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' [Citation.] In this regard, 'California law and federal constitutional requirements are the same. . . .' [Citation.]" (*Id.* at p. 622.) The prosecution shows due diligence where its "efforts are timely, reasonably extensive and carried out over a reasonable period." (*People v. Bunyard* (2009) 45 Cal.4th 836, 856.) In contrast, diligence is lacking where the prosecution's efforts to locate the witness "have been perfunctory or obviously negligent." (*Id.* at p. 855.)

Defendants rely primarily on isolated examples of steps the prosecution did not take in cases involving deported witnesses where the prosecution's efforts were perfunctory or obviously negligent. This misunderstands the concept of due diligence. For instance, in *Roldan*, the court of appeal held broadly that "the government cannot simply throw up its hands and do nothing when faced with the prospect of one of its witnesses being deported or leaving the country on his own accord. Instead, it must undertake reasonable efforts to preserve the defendant's constitutional right to be confronted with the witnesses against him." (*Roldan*, *supra*, 205 Cal.App.4th at p. 980.) In doing so, the court reviewed various "things the prosecution could have done to protect Roldan's right of confrontation," including seeking detention of the since-deported witness under section 1332. (*Id.* at pp. 980, 981.) The court did not hold that this particular act was required. Instead, it held that seeking detention was a "factor" in its analysis and noted that while "courts have sanctioned the months-long detention of material witnesses when they possess vital information about the alleged offenses," "due process considerations prevent the years-long detention of a witness whose testimony is relatively unimportant to the prosecution's case." (*Id.* at p. 981.) Hence, while the prosecution has a " 'duty to use reasonable means to prevent a witness from becoming

23

absent' " (*People v. Louis* (1986) 42 Cal.3d 969, 991), it would not have been reasonable to attempt to prevent Pantoja's deportation prior to trial by seeking to detain him for two and a half years.  And as the trial court also noted, the prosecution in this case performed the one act that *Roldan does* require:  "At an absolute minimum, the prosecution should have at least notified defense counsel of Barrera's impending deportation so he 'could take such action as [he] deemed necessary to make [Barrera] available at trial.' [Citation.]"  (*Id*. at 985.)  Thus, *Roldan* is distinguishable from this action.

*People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*) presents the opposite situation as this case—the deported witness told the investigator that he was willing to testify if he was provided financial assistance for travel to first obtain a passport and visa and then to California, but *the prosecution* decided not to assist the witness with the $100 he needed for the first trip.  (*Id*. at p. 1432, italics added.)  Here, it was Pantoja who changed his mind.  As with *Roldan*, defendants rely on one example from *Sandoval* of options the prosecution did not utilize—a portion of the Treaty on Cooperation Between the United States of America and the United Mexican States for Mutual Legal Assistance that "allows a prosecutor in the United States to request that a witness in Mexico be compelled by Mexican authorities to appear and testify, but only in Mexico."  (*Id*. at p. 1439.)  Again, these examples must not be viewed in isolation.  As our Supreme Court has explained, *Sandoval* and similar authorities "make clear that, when a criminal trial is at issue, unavailability in the constitutional sense does not invariably turn on the inability of the state court to compel the out-of-state witness's attendance through its own process, but also takes into consideration the existence of agreements or established procedures for securing a witness's presence that depend on the voluntary assistance of another government.  [Citation.]  Where such options exist, the extent to which the prosecution had the opportunity to utilize them and endeavored to do so *is relevant* in determining whether the obligations to act in good faith and with due diligence have been met." (*People v. Herrera, supra,* 49 Cal.4th at p. 628, italics added.)  We do not agree the trial

24

court erred in holding that the prosecution exercised due diligence simply because the prosecution did not specifically ask Mexican authorities to obtain Pantoja's testimony in Mexico via teleconference. The court in *Sandoval* did not, either: "We need not, and do not, hold that live teleconferenced testimony from a remote location is necessary to meet the demands of the confrontation clause in cases in which the witness refuses to attend trial and cannot be compelled. We also need not and do not hold that such remote testimony would be constitutionally acceptable in the place of face-to-face confrontation." (*Sandoval, supra,* at p. 1443.) Instead, the court stated it was "sufficient . . . to point out, however, that the prosecution had several reasonable alternatives it could have pursued to obtain Zavala's live testimony at trial. Instead of making a good faith effort to obtain *any* category of contemporary, live testimony, the prosecution threw up its hands and asserted Zavala was unavailable simply because he was a foreign citizen residing outside of the United States." (*Ibid.*, italics added.) As discussed above, in the instant case, the prosecution did not throw up its hands, but made reasonably extensive efforts to obtain Pantoja's testimony at trial. "[T]he circumstance that 'additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' [Citations.]" (*People v. Fuiava, supra,* 53 Cal.4th at p. 677.) Accordingly, we conclude the trial court properly admitted Pantoja's preliminary hearing testimony at defendants' trial.

D.     *Bustillos' Identification of Delamora*

Delamora contends his conviction should be reversed because Bustillos' live lineup and in-court identifications were tainted by unduly suggestive pretrial identification procedures in violation of Delamora's right to due process. Delamora concedes that the fact that he was the only person to appear in both the photographic lineup and the physical lineup is not generally improper, but contends it was here because

25

Bustillos' original description of Delamora was only partially correct,[6] his identification in the photographic lineup was incorrect, and Delamora alleges Bustillo was "extremely interested in knowing whether he had chosen the right individual." Delamora suggests, then, that Bustillos realized his first identification was incorrect and decided to identify the individual the police had showed him twice. This speculation is insufficient to satisfy Delamora's burden.

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) "Defendant bears the burden of showing unfairness as a demonstrable reality, not just speculation." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222.) "We independently review 'a trial court's ruling that a pretrial identification procedure was not unduly suggestive.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 698-699.) And if we conclude that the challenged identification procedure was not unduly suggestive, this ends our inquiry into the due process claim. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1256.) In other

---

[6] Bustillos described the shooter as wearing a black baseball cap, a Sacramento Kings jersey ("possibly" number 10) with a white T-shirt underneath, and saggy blue jeans. The shooter was very slender and looked white or Hispanic. His goatee appeared red and what little hair Bustillos could see under the hat appeared to be blond. The record seems to confirm Delamora's representation that he has black hair, a black goatee, and was wearing a number 23 Kings jersey on the evening of the shooting.

words, Delamora must show something was wrong with the procedure as a threshold matter before we may continue to the issue of the reliability of the identification. He cannot.

"[T]he fact that defendant alone appeared in both a photo lineup and a subsequent live lineup does not per se violate due process." (*People v. Cook* (2007) 40 Cal.4th 1334, 1355 [agreeing with trial court that defendant failed to show that the identification procedures were unduly suggestive].) And Delamora does not point to any other aspect of the identification *procedure*. Thus, his argument is tantamount to a request that we find that the sole fact that Delamora was the only person to appear in both lineups violated his due process rights. The accuracy of Bustillos' identification was a question for the jury and any inconsistencies in his original description of Delamora are matters that affect the weight of his testimony, not its admissibility. (See *People v. Virgil, supra,* 51 Cal.4th at p. 1256 ["Inconsistencies in [the witness's] descriptions of the man she saw, and in her accounts of her activities on the day of the murder, are matters affecting the weight of her eyewitness testimony, not its admissibility"].) Similarly, speculation regarding Bustillos' motivation goes to the weight of his identification rather than its admissibility. Because Delamora has not shown that the identification procedures were impermissibly suggestive, his due process claim fails. The trial court did not err in declining to suppress Bustillos' pretrial identification and resulting in-court identification of Delamora.

E.     *Jury Instructions Regarding Corroboration of Accomplice Testimony*

Delamora asserts that the trial court had a sua sponte duty to instruct the jury with CALCRIM No. 334 or 335 regarding the corroboration of accomplice testimony. These instructions are based in part on section 1111, which provides, in part, that, "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or

the circumstances thereof." The model instructions both include a warning that, "Any (statement/ [or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/ [or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence." (CALCRIM Nos. 334 & 335.)

Even assuming that the trial court erred by failing to give one of these instructions, we find the error to be harmless. "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating evidence in the record." (*People v. Lewis* (2001) 26 Cal.4th 334, 370.) "Corroborating evidence may be slight, entirely circumstantial, and entitled to little consideration when standing alone. [Citations.] It need not be sufficient to establish every element of the charged offense or to establish the precise facts to which the accomplice testified. [Citations.] It is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Valdez* (2012) 55 Cal.4th 82, 147-148.)

Delamora contends that the evidence against him was circumstantial, but circumstantial evidence is enough. (See *People v. Valdez, supra,* 55 Cal. 4th at p. 147.) And while it is true that at one point Sergeant Costa incorrectly identified Pantoja as the shooter and that some of the witnesses' descriptions of Delamora were imperfect, as he emphasizes elsewhere in his brief, this is often the case with eyewitness testimony. More significantly, he ignores the most powerful corroborative evidence against him. Bustillos identified Delamora as the shooter. Pamela Dow, the witness who had a view of the 47th Avenue off-ramp, said that the driver was yelling for "Chino." Gonzalez confirmed Chino is Delamora's nickname and testified that only Montano and Delamora were outside when the shots were fired, and Delamora never returned to the motel after the shooting. This evidence was sufficient corroboration to connect Delamora with the

28

shooting and chase. (See *People v. Boyer* (2006) 38 Cal.4th 412, 467, superseded by statute on other grounds [finding ample corroboration connecting defendant with murders in part based on evidence that his girlfriend testified that defendant left their house with alleged accomplice, then later returned with him, on the night of the murders].) Thus, any error in not giving an accomplice testimony instruction was harmless.

Delamora argues alternatively that, even assuming there was sufficient corroborating evidence, reversal is required because the trial court's failure to give the cautionary instruction regarding accomplice testimony is reversible error under *People v. Watson* (1956) 46 Cal.2d 818. Our Supreme Court rejected this argument in *People v. Gonzales and Soliz* (2001) 52 Cal.4th 254, 303-304. The fact that there was sufficient corroborating evidence of the accomplice testimony renders the omission of these instructions harmless and ends our analysis. (*Id*. at p. 304.)

F.    *Montano's Convictions for Aiding and Abetting*

Montano asserts that there is insufficient evidence to support his convictions under an aiding and abetting theory. " 'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' [Citation.]" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.) "[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing— which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.) " 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding

29

and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' [Citation.]" (*People v. Nguyen, supra,* at p. 1054.)

We "review the whole record in the light most favorable to the judgment . . . to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331, quoting *People v. Redmond* (1969) 71 Cal.2d 745, 755.) In other words, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Nguyen, supra,* 61 Cal.4th at p. 1055.)

With respect to counts 1-4, which are specific to the shooting at the Sunnyslope apartment complex, Montano contends there was no evidence he knew or had reason to know Delamora was going to take the assault rifle and shoot, or that he encouraged or facilitated Delamora's shooting. We disagree. The assault rifle belonged to Montano. The testimony of Pantoja and Gonzalez suggested the gun was in the trunk of the car when Delamora and Montano arrived at the Sunnyslope apartments. Felina Lucky, a resident at Sunnyslope apartments, told law enforcement that she saw two Hispanic men talking by a car on the night of the shooting. She saw the taller of the two men open the trunk of the car. The shorter man was looking into the trunk and the two were talking. "The taller guy told the shorter guy to wait for the chicka to go inside." The jury was entitled to infer that Montano gave Delamora access and permission to use the gun. Montano's statements to detectives were consistent with this inference: When he was asked why he would "allow" someone else to use his gun, he explained that that is the responsibility of the passenger. He did not dispute that Delamora had his permission.

30

With respect to counts 5, 6, 7, 12 and 13, the evidence is even stronger. Again, Montano explained why Delamora was the one using the gun: "Cause like I said, I was the driver. When you run passenger, you're the trigger man. Simple as that." Montano's assertion that his driving was motivated solely by fear is also contradicted by his boastful statements to the detectives. Moreover, Montano spoke ominously about what *he* might have done to the security officer that spotted Montano when he got out of his car briefly after losing control on the off-ramp: "I was like yeah, that's my car. Good thing he didn't get close to me." In short, there was substantial evidence that Montano was an equal participant in all of the shootings.

G.      *Conspiracy and the Natural and Probable Consequences Doctrine*

The jury was also instructed on the requirements for proving that Montano was a member of a conspiracy to commit the crime of evading a peace officer. Montano does not contend that the evidence was insufficient to support this finding. Instead, his complaint is with respect to a related instruction regarding liability for coconspirators' acts. With respect to counts 5-12, the jury was also instructed, in part, that it could find a defendant guilty if the People proved that: "1. The defendant conspired to commit the crime of evading a peace officer; [¶] 2. A member of the conspiracy committed attempted murder or assault with a semiautomatic firearm on a peace officer or discharge of a firearm at an occupied vehicle to further the conspiracy; and [¶] 3. Attempted murder or assault with a semiautomatic firearm on a peace officer or discharge of a firearm at an occupied vehicle were natural and probable consequences of the common plan or design of the crime that the defendant conspired to commit." Montano contends that attempted murder is not a natural and probable consequence of evading a peace officer and the jury instructions unconstitutionally shifted the burden of proof.

1. *The Natural and Probable Consequences Doctrine*

The natural and probable consequences doctrine applies to conspirators and aiders and abettors. (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-261.) It provides that

31

"each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as a part of their common unlawful design." (*People v. Zielesch* (2009) 179 Cal.App.4th 731, 739.) Whether an unplanned crime is a natural and probable consequence of a conspiracy to commit the intended crime does not depend on whether a conspirator " '*actually* foresaw the additional crime, but whether, judged objectively, [the unplanned crime] was *reasonably* foreseeable.' [Citation.]" (*Ibid.*) An unplanned crime need not even have been a strong probability. (*Ibid.*) "Whether the unplanned act was a 'reasonably foreseeable consequence' of the conspiracy must be 'evaluated under all the factual circumstances of the individual case' and 'is a factual issue to be resolved by the jury' [citation], whose determination is conclusive if supported by substantial evidence [citations]." (*Id.* at pp. 739-740.)

Similarly, "[t]he test for determining whether instructions on a particular theory of guilt are appropriate is whether there is substantial evidence which would support conviction on that theory." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 528.) Montano argues that, as a matter of law, attempted murder is not a natural and probable consequence of evading a peace officer. In support of this assertion, he notes that evading a peace officer is not an inherently dangerous felony for purposes of the second degree felony-murder rule. (See *People v. Howard* (2005) 34 Cal.4th 1129, 1132.) But a target crime need not be inherently dangerous for the nontarget crime to be a natural and probable consequence. (See *People v. Culuko* (2000) 78 Cal.App.4th 307, 322 ["The natural and probable consequences doctrine operates independently of the second degree felony-murder rule. It allows an aider and abettor to be convicted of murder, without malice, *even where the target offense is not an inherently dangerous felony*," (italics added)].) Indeed, whether any nontarget crime is a natural and probable consequence of any target crime is not "to be considered in the abstract as a question of law." (*People v.*

32

*Nguyen, supra,* at p. 531.) Again, it is "a factual question to be resolved by the jury in the light of all the circumstances." (*Ibid.*)

And here there is substantial evidence to support a theory that count 5, attempted murder of a peace officer; count 6, assault with a semiautomatic firearm on a peace officer; count 7, attempted murder of Kevin Tasler; and count 12, discharging a firearm at an occupied motor vehicle were all reasonably foreseeable results of a plan to evade Sergeant Costa—especially after Delamora had fired the assault rifle at the apartment complex and at Sergeant Costa. The prosecutor framed it reasonably in his closing argument: "Now, ask yourself, [Montano's car] pulls into the cul-de-sac, . . . gets blocked in, Sergeant Costa pulls the C.H.P. vehicle into the opening of the court, essentially blocking their way out, all right, the individual in your car who has just fired 24 rounds out of your AK-47 at some individuals at the apartment complex . . . then takes that weapon as you're trapped there and comes up over the hood—out your window and over the hood and fires a couple of shots at that C.H.P. vehicle, causing that C.H.P. vehicle to back out, leaving an opening for you to flee, all right, at that point there may be no more logical natural and probable consequence of your flight than this individual with the AK-47 firing at the police officer that's now pursuing. He's already done it. He's already fired off a bunch of rounds at an apartment complex. He's fired at this very same Highway Patrol vehicle. Big shock he's going to fire some more. He's still hanging out your window with the weapon. . . . There's nothing more natural and probable. It's already happened. [¶] And here you are driving down the freeway at whatever rate of speed, 100, 120, 130 . . . , with this guy firing your AK-47, and you're surprised? That makes no sense." The jury instructions regarding the natural and probable consequences doctrine were proper.

### 2. *Due Process*

Montano also contends the jury instructions regarding the natural and probable consequences doctrine violated his due process rights because, under these instructions,

33

the prosecution was not required to prove that Montano had the intent to commit murder, only the intent to evade arrest. Our Supreme Court has considered and rejected similar arguments. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107 ["To the extent Coffman contends that imposition of liability for murder on an aider and abettor under this doctrine violates due process by substituting a presumption for, or otherwise excusing, proof of the required mental state, she is mistaken"]; see also *People v. Richardson* (2008) 43 Cal.4th 959, 1021-1022.) As Montano acknowledges, the natural and probable consequences doctrine is the law in this state, and we find no compelling reason to find that the jury was improperly instructed on it in this case. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [courts of appeal bound by California Supreme Court decisions].)

## H.     *Necessity Defense*

Montano argues that section 186.22, also known as the Street Terrorism Enforcement and Prevention Act (the STEP Act), denied him his right to present a full and fair defense. He contends that the only reason the necessity defense was not available to him was because he is an admitted Sureño gang member. Montano cites nothing in the record to indicate that the trial court rejected a request for a necessity defense, let alone on these grounds. Nonetheless, a necessity defense would not have been supported by substantial evidence. "To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that []he violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which []he did not substantially contribute to the emergency." (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135.) Further, "[s]ince the defense of necessity is based on public policy, we must look to public policy to determine whether the defense was available to the

34

defendant on the facts presented here." (*People v. Youngblood* (2001) 91 Cal.App.4th 66, 73.) While the record contains evidence that Delamora told Montano not to pull over and that Montano was generally fearful of the situation he was in, this by itself is insufficient to conclude that driving in excess of 100 miles per hour on the freeway while Delamora fired *Montano's* assault rifle out of the window could be justified by a necessity defense.

I.      *Gang Enhancement*

Defendants contend that the evidence was insufficient to support the imposition of a gang enhancement under section 186.22, subdivision (b)(1). The STEP Act imposes an additional term of imprisonment on "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) For purposes of this sentence enhancement, a "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in [the statute], having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (*Id*., subd. (f).) A "pattern of criminal gang activity" is "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of [certain] offenses [identified in the statute], provided at least one of these offenses occurred after the effective date of [the law] and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (*Id*., subd. (e).)

Delamora and the People submitted supplemental briefs regarding the effect of our Supreme Court's recent decision in *Prunty, supra*, 62 Cal.4th 59. In that case, "the prosecution's theory was that defendant Zackery Prunty committed an assault to benefit the Sacramento-area Norteño street gang" and our Supreme Court "decide[d] what type

35

of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets." (*Id*. at p. 67.) Here, the prosecution's theory was that defendants committed their offenses to benefit the Sureño gang. Accordingly, we begin with a review of the evidence presented by the prosecution with an eye to determining whether this case also turns on the conduct of one or more subsets.

      *1. Detective Sample's Testimony*

The prosecution's gang expert, Detective John Sample, testified that there are approximately 600 Sureños in Sacramento. "[I]n Sacramento, you have the wider umbrella of Norteños and Sureños being rivals, and then under the Sureño group, there's smaller facets or smaller groups within that group of Sureños, and oftentimes they'll be . . . geographical areas where people will claim a various subset." These subsets include Barrio Sur Trece, Triangle Park, Howe Park and Brown Pride. There are about 65 Howe Park Sureños and 30-something Brown Pride Sureños. Sureños are affiliated with the Mexican Mafia prison gang. Sacramento Sureño gangs are "consistent with the model that's seen in prisons."

Howe Park Sureños "will use HPS or the letters—the H and the P and the S for their particular subsets. Um, the same with the other subsets using their particular abbreviations." Howe Park Sureños will often wear a Pittsburg Pirates hat, sometimes with "Parkero" or "Park Life" added to the back. Sureños generally use different depictions of the number 13 (such as Roman numerals or the letter X and three dots), "the letter S or any association to Sur or Sureño," and the color blue as common identifiers. He also described derogatory terms Sureños and Norteños use to describe their rivals. Detective Sample testified that some of the primary activities of the Sureños are illegal firearms possession, drive-by shootings, assault with a deadly weapon and murder. He testified as to predicate offenses committed by individuals he described only as Sureños, again without specifying a subset. Detective Sample explained that, even though, while

36

in prison, Delamora claimed to be a drop-out of the Howe Park Sureños, there were subsequent indications of active gang membership, including Delamora wearing a Pittsburg Pirate's hat on the night of the shooting and letters in which Delamora signed his name, "Mr. chino sick ass park sider HPS murder gang trece." Both defendants have at least one tattoo with one dot and then three dots indicating membership in the Sureños. Montano also has BPS—for Brown Pride Sureños—tattooed on the back of his neck in blue. Detective Sample opined that Delamora and Montano are active Sureño gang members.

The prosecution then asked Detective Sample to consider two scenarios where an active Howe Park Sureño gang member and an active Brown Pride Sureño gang member engaged in activities that were similar to various versions of the events of April 11, 2010. In the first scenario, Detective Sample was asked to assume that the Sureño members encountered a group of individuals in an apartment complex, including at least one Norteño. In the second scenario, he was asked to assume that the individual thought to be a Norteño was actually not. Detective Sample opined that such shootings would be committed in association with Sureño gang members, and would benefit the Sureño gang members individually and the gang as a whole, regardless of whether their victims were in fact Norteños.

### 2. *Sufficiency of the Evidence*

In *Prunty,* our Supreme Court held "that the STEP Act requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang." (*Prunty, supra,* 62 Cal.4th at p. 67.) And "where the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22[, subdivision ](f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets." (*Id.* at p. 71.)

37

The STEP Act also "requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22[, subdivision ](f), must be one and the same." (*Prunty*, *supra*, 62 Cal.4th at pp. 75-76.) "And where . . . the alleged perpetrators of the predicate crimes under section 186.22[, subdivision ](f) are members of particular subsets, the behavior of those subsets' members must connect them to the gang the defendant sought to benefit." (*Id*. at p. 80.) The court in *Prunty* offered illustrative examples of how to prove the requisite associational or organizational connection (*id*. at p. 67), but for our purposes *Prunty* itself is the only example required:

The evidence showed that Prunty identified as Norteño generally and that he claimed membership in a Detroit Boulevard subset. (*Prunty*, *supra*, 62 Cal.4th at pp. 67-68.) He and his companion, Emilio Chacon, were at a fast-food restaurant when they confronted Gustavo Manzo, who was wearing a baseball cap "typically associated with Sureño street gangs." (*Id*. at p. 68.) Chacon was a member of the Varrio Franklin Boulevard Norteño subset, based out of South Sacramento. (*Ibid*.) Manzo and Prunty exchanged words, with Prunty calling Manzo derogatory terms Norteño gang members use for Sureño gang members and vice versa. (*Ibid*.) "Eventually Manzo advanced on Prunty, and Prunty drew a gun and fired six times," injuring Manzo and his girlfriend's brother. (*Ibid*.)

Detective Sample was also the gang expert in *Prunty*. His testimony about the Sacramento-area Norteño gang's general existence and origins, its use of shared signs, symbols, colors and names, and its primary activities was similar to his testimony regarding the Sacramento-area Sureño gang in this appeal: "Sample testified that the Norteños are 'a Hispanic street gang active in Sacramento and throughout California' with about 1,500 local members. Sample explained that Sacramento-area Norteños are not associated with any particular 'turf' but are instead 'all over Sacramento' with 'a lot

38

of subsets based on different neighborhoods.'  Sample described the 'primary activities' of Sacramento-area Norteños as unlawful homicide, attempted murder, assault, firearms offenses, and weapons violations.  Sample also testified that Norteños share common names, signs, and symbols, including names derived from 'the north, Norteños, [and] northerner,' the letter N, the number 14, and the color red.  The 'Norteños' enemy,' moreover, is the Sureño street gang, whose members identify with the color blue, the letters S and M, and the number 13.  Both the Norteños and the Sureños 'originated out of the California prison systems' in the 1960s and 1970s.  The Sureños are associated with the Mexican Mafia prison gang, while the Norteños have a 'street gang association' with the Nuestra Familia, or NF, prison gang.  Finally, Sample described various other aspects of Norteño and Sureño gang culture generally, including the appearance of gang graffiti and gang signs as well as each gang's use of common derogatory statements about its rivals." (*Prunty*, *supra*, 62 Cal.4th at p. 69)

The court held that "where the prosecution's evidence fell short is with respect to the predicate offenses." (*Prunty*, *supra*, 62 Cal.4th at p. 82.)  The prosecution introduced evidence of two predicate offenses involving three alleged Sacramento Norteño subsets—Varrio Gardenland Norteños, Del Paso Heights Norteños and Varrio Centro Norteños. (*Ibid.*)  Detective Sample characterized these groups as Norteños, but "he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang." (*Ibid*.)  In particular, he "never addressed the Norteño gang's relationship to any of the subsets at issue. . . . Instead, Sample simply described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses." (*Id*. at p. 83.)  While he testified that Norteño street gangs are associated with the Nuestra Familia prison gang, this "does not indicate whether the specific subsets involved in committing the predicate offenses have any ongoing relationship—the kind of relationship that amounts to being part of the same group—with the entity the defendant sought to benefit." (*Ibid*.)  This testimony was

insufficient "to permit the jury to infer that the organization, association, or group at issue included the subsets that committed the predicate offenses." (*Id*. at p. 81.)

The People contend this case is distinguishable from *Prunty* because here with respect to the predicate acts "Detective Sample provided testimony relating to one gang—the Sureño gang in Sacramento County." This argument is at odds with our Supreme Court's statement that it "granted Prunty's petition for review to address the type of evidence required to support the prosecution's theory that various alleged gang subsets constitute a single 'criminal street gang' under section 186.22[, subdivision ](f)." (*Prunty*, *supra*, 62 Cal.4th at p. 70.) Additionally, Detective Sample did not testify that Sacramento Sureños are one gang; he testified that there are different subsets, just as he explained with regard to Sacramento Norteños in *Prunty*. Thus, *Prunty* controls this case because it too "turns on the conduct of one or more gang subsets." (*Id*. at p. 67.) We also reject the People's contention that the prosecution established the requisite associational or organizational connections. The evidence here is substantially similar to the evidence that was held insufficient in *Prunty*, except for the fact that here Detective Sample did not specify which subsets the individuals who committed the predicate offenses were involved in. We do not believe that giving *less* information can cure a *Prunty* issue. Without knowing what subsets were involved in the predicate offenses, we cannot begin to determine whether the requisite associational or organizational connections exist. We are compelled by *Prunty* to conclude the evidence was not sufficient to support the gang enhancements.[7] We must therefore reverse the gang enhancement findings as to both

---

[7] Consequently, we need not reach the other arguments defendants raise with respect to the gang enhancement. They are, however, without merit. First, defendants incorrectly contend that expert testimony is insufficient to substantiate a jury's findings that the crimes were committed for the benefit of a criminal street gang. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1048 [" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the . . . section 186.22, subdivision (b)(1), gang enhancement"].) Second, we reject Montano's

40

defendants. Moreover, because Montano was also found to qualify for an enhancement under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b) as an element of that enhancement, we must also reverse this enhancement finding as to Montano.

*J.        Section 654*

Delamora argues that under section 654, the trial court erred in imposing consecutive sentences on count 5, attempted murder of a peace officer; count 6, assault with a semiautomatic firearm on a peace officer; count 7, attempted murder of Kevin Tasler; and count 12, discharging a firearm at an occupied motor vehicle. We disagree.

In relevant part, section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Even though section 654 refers to an "act or omission," in *Neal v. State of California* (1960) 55 Cal.2d 11 (*Neal*), our Supreme Court "opined that '[f]ew if any crimes . . . are the result of a single physical act.' [Citation.] Accordingly, the relevant question is typically whether a defendant's ' "course of conduct . . . comprised a divisible transaction which could be punished under more than one statute within the meaning of section 654." ' [Citation.] To resolve this question, the *Neal* court announced the following test: 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective,

_____

complaint, unsupported by any citation to the record, that Detective Sample was improperly permitted to testify that, in his opinion, Montano's actions were intended to benefit the Sureño street gang. The prosecution asked Detective Sample hypothetical questions, closely tracking the facts in this case, about whether certain acts were gang related. This is also proper under *People v. Vang*, *supra,* at p. 1048.)

41

the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Correa* (2012) 54 Cal.4th 331, 335-336.) An implicit determination that there was more than one objective is a factual determination that must be sustained on appeal if it is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730.) But, "the dimension and meaning of section 654 is a legal question. 'The applicability of a statute to conceded facts is a question of law.' [Citation.]" (*People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.)

Our Supreme Court has noted that "[d]ecisions since *Neal* have limited the rule's application in various ways. Some have narrowly interpreted the length of time the defendant had a specific objective, and thereby found similar but *consecutive* objectives permitting multiple punishment." (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1212.) As an example, the court cited *People v. Trotter* (1992) 7 Cal.App.4th 363 (*Trotter*), which tells a familiar story. The defendant fired three gunshots at a pursuing police officer while driving on the freeway. (*Id*. at p. 366.) The first two shots were about a minute apart; the third shot was fired "[s]econds later." (*Ibid*.) The defendant was convicted of three counts of assault on a peace officer with a firearm, one count of evading a police officer with willful and wanton disregard for the safety of others, and one count of unlawfully taking a vehicle. (*Id*. at p. 365.) The trial court imposed consecutive sentences on the first two assault charges and stayed the sentences on the other charges. (*Ibid*.) On appeal, the defendant contended section 654 precluded him from being sentenced consecutively for two of the three assaults. (*Id*. at p. 366.) The appellate court disagreed, stating: "The purpose behind section 654 is 'to insure that a defendant's punishment will be commensurate with his culpability. [Citation.]' [Citation.] Defendant's conduct became more egregious with each successive shot. Each shot posed a separate and distinct risk to [the officer] and nearby freeway drivers. To find section 654 applicable to these facts would violate the very purpose for the statute's existence. [¶] Furthermore, this was not a case where only one volitional act gave rise to

42

multiple offenses. Each shot required a separate trigger pull. All three assaults were volitional and calculated, and were separated by periods of time during which reflection was possible. None was spontaneous or uncontrollable." (*Id*. at pp. 367-368, fn. omitted.) "[E]ven under the long recognized 'intent and objective' test, each shot evinced a separate intent to do violence." (*Id.* at p. 368.)

Here, Delamora's conduct is even more clearly divisible than the defendant's conduct in *Trotter*. He shot at Sergeant Costa and Tasler at the cul-de-sac in the mobile home park and then again on Stockton Boulevard. Then, he fired at least 20 different times on the freeway over the course of several miles. As in *Trotter*, Delamora's conduct became more egregious with each successive shot and each new location, and each shot posed a separate and distinct risk to Sergeant Costa, Tasler and nearby drivers and passengers such as the West family.

Delamora contends that *Trotter* is distinguishable because, rather than being charged with multiple counts for violation of the same statute, Delamora was charged with different statutes "based on the same act of shooting at a vehicle containing the officer and his ride along." But where the court could have imposed consecutive sentences for multiple counts of attempted murder of a peace officer if the prosecution had so charged, we cannot find that section 654 prevents the imposition of consecutive sentences where the prosecution charged lesser offenses instead. Under these circumstances, the trial court did not err in imposing consecutive sentences.

*K.     Order for Attorney Fees*

At sentencing, the court ordered Delamora to pay "attorney's fees in the amount of $3,175. That's based on ability to pay." Delamora did not object to the fee at sentencing. On appeal, he asserts that the order for attorney fees must be stricken because the court's determination regarding ability to pay did not comply with the requirements of section 987.8 and was not supported by sufficient evidence.

43

Penal Code section 987.8 permits a court to order a defendant to pay the cost of court-appointed counsel after a hearing to determine if defendant has the ability to pay. "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, . . . the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." (§ 987.8, subd. (b).) In determining this ability to pay, the court may consider both defendant's present financial position and the defendant's reasonably discernible future financial position, limited to six months in the future. (§ 987.8, subd. (g)(2)(B).) And "[u]nless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense." (*Ibid.*)

The People argue that Delamora has forfeited the claim of insufficient evidence of the ability to pay by failing to object in the trial court. Delamora contends no objection is required to preserve the issue for appeal, citing *People v. Viray* (2005) 134 Cal.App.4th 1186 (*Viray*). In *Viray*, the appellate court held that a forfeiture to an appellate challenge to an attorney fee reimbursement order cannot "properly be predicated on the failure of a trial attorney to challenge an order concerning his own fees," given the "patent conflict of interest." (*Id*. at p. 1215, italics omitted.)

The People, in turn, rely on *People v. Aguilar* (2015) 60 Cal.4th 862, in which our Supreme Court held the forfeiture rule applied where the defendant failed to object to the amount of counsel fees or to assert the inability to pay in the trial court. In *Aguilar*, however, our Supreme Court noted the case did not present, "and we therefore do not address, the question whether a challenge to an order for payment of the cost of the services of appointed counsel is forfeited when the failure to raise the challenge at sentencing may be attributable to a conflict of interest on trial counsel's part." (*Id*. at

44

p. 868, fn. 4.) Nor did the case concern the statutory presumption of section 987.8, subdivision (g)(2)(B), for defendants who are sentenced to prison.

In this appeal, Delamora *does* raise the possibility that the failure to object was due to a conflict of interest. Because the issue of the applicability of *Viray* is unsettled and a statutory presumption is involved—requiring the trial court to find "unusual circumstances" to order reimbursement from a state prisoner—we reach the merits of Delamora's claim and review for substantial evidence.

The record appears to contain no evidence suggesting Delamora had an ability to pay his attorney fees. The People do not argue otherwise. The probation report indicates Delamora "has never held a job" and prior to his arrest, he "resided with and was financially supported by his mother." Delamora "indicated he received $200.00 in food stamps per month." Moreover, the court ordered Delamora to pay restitution and fees in addition to the attorney fees order. Further, there is a statutory presumption that because Delamora was sentenced to prison, he had no future ability to pay absent unusual circumstances. The trial court failed to make that finding, and we see no basis for finding unusual circumstances. The statutory presumption controls; Delamora had no future ability to pay. Because Delamora had no ability to pay, based on either his present or future financial position, we reverse the order for attorney fees.

## L.    *No Cumulative Error*

We reject defendants' contention that the cumulative effect of their alleged errors requires reversal. We have reversed the jury's finding, as to both defendants, that the crimes were committed for the benefit of a criminal street gang and the order, as to Delamora, for reimbursement of attorney fees, and will remand the matter to the trial court for resentencing. This does not, however, affect defendants' convictions or the remaining allegations that were found to be true. We have assumed the trial court erred in only one other instance—in failing to instruct the jury regarding accomplice

testimony—and we concluded the error was harmless.  Thus, there is no prejudice to cumulate.

### III.  DISPOSITION

We strike the enhancement under section 186.22 subdivision (b), as to both defendants and the enhancement under section 12022.53, subdivision (e)(1) as to defendant Montano.  We also reverse the order for reimbursement of attorney fees as to defendant Delamora.  The judgment is affirmed in all other respects.  The matter is remanded to the trial court for resentencing consistent with this opinion.  The clerk of the superior court is then directed to prepare amended abstracts of judgment and to forward certified copies of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

/S/

RENNER, J.

We concur:

/S/

ROBIE, Acting P. J.

/S/

BUTZ, J.